ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| MARYMAR 801 ACQUISITON, LCC<br><br>APELANTE<br><br>V.<br><br>STEWART TITLE GUARANTY COMPANY<br><br>APELADO | KLAN202400802 | *APELACIÓN* procedente del Tribunal de Primera Instancia Sala de San Juan<br><br>Sala: 903<br><br>Caso Núm. SJ2021CV08127<br><br>Sobre: Daños Seguros, Incumplimiento de Contrato |
| --- | --- | --- |

Panel integrado por su presidenta, la juez Brignoni Mártir, el juez Candelaria Rosa, la jueza Alvarez Esnard, y la jueza Díaz Rivera

Brignoni Mártir, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 15 de enero de 2025.

Comparece Marymar 801 Acquisition, LLC (Marymar o la Apelante) y solicita la revocación de la Sentencia emitida el 2 de julio de 2024, por el Tribunal de Primera Instancia, Sala de San Juan (TPI o foro primario) notificada el 9 de julio del corriente año. Mediante la referida Sentencia, el foro primario declaró *Ha Lugar* la *Moción de Sentencia Sumaria* presentada por Stewart Title Guaranty Company (Stewart Title o la Apelada), así como sus réplicas y dúplicas y desestimó sumariamente la Demanda en Daños e Incumplimiento de Contrato de Seguros, presentada por Marymar en contra de la Apelada.

Por los fundamentos que expondremos a continuación confirmamos la Sentencia apelada.

**I.**

El 10 de diciembre d 2021, Marymar presentó Demanda en daños e incumplimiento de contrato de seguros en contra de Stewart Title.[1] En

---

[1] *Véase* páginas 0042-0062 del Apéndice de la Apelación presentada por Marymar.

apretada síntesis la Apelante alegó que el 6 de junio de 2003, Roberto Manuel Cacho Pérez e Ileana Margarita Cambó Saavedra ("matrimonio Cacho-Cambó"), otorgaron un Pagaré al portador por la suma principal de $500,000.00, más los intereses y créditos allí pactados garantizado con una hipoteca que gravaba el apartamento 801 del Condominio Marymar (finca 43,805) y dos "storage cellars" (fincas 43,806 y 43,807). Sostuvo la Apelante en la Demanda que el 30 de agosto de 2005, se modificó la hipoteca y el Pagaré al portador para extender su vigencia y los intereses previamente pactados. Ese mismo día Stewart Title emitió una póliza de título para asegurar el Pagaré al portador modificado. Marymar, señaló en la Demanda que el riesgo asegurado consistió en que la modificación no afectaría el rango de primera hipoteca que ostentaba en el Registro de la Propiedad ni los derechos en cuanto a la finca 43,805. Marymar argumentó además, que Infra Limited, S.E. ("Infra"), era el "titular" del referido Pagaré al portador y que Infra estableció una relación crediticia con Westernbank Puerto Rico (en adelante, "Westernbank"), en la que entregó el Pagaré al portador como colateral adicional. Señaló que en el año 2010 los activos de Westernbank fueron traspasados al Banco Popular de Puerto Rico ("Banco Popular") por la insolvencia de Westernbank y que posteriormente Banco Popular inició acciones de cobro y ejecución de hipoteca en contra de varias entidades, entre estas, Infra. Alegó la Apelante, en la Demanda que para el año 2014, Banco Popular llegó un acuerdo con Infra y otras entidades relacionadas a esta como pago total de las deudas reclamadas; que los fondos para satisfacer dicho pago provinieron de un tercero denominado "Settlement Funds Provider" y que finalmente el Pagaré al portador fue devuelto a Infra como resultado de varias transacciones entre estas entidades.

Marymar indicó en la Demanda que en el año 2016 Infra **la creó y le cedió el Pagaré al portador**, con el propósito de ejecutar la hipoteca en garantía del Pagaré al portador que ocupaba el primer rango en el Registro de la Propiedad. Sin embargo, Marymar alegó que Scotiabank, acreedor posterior, instó pleito de ejecución en contra del matrimonio Cacho-Cambó

e intervención en el de ejecución instado por Marymar. Señaló Marymar que Scotiabank planteó que la hipoteca objeto de su acreencia advino en primer rango luego de la modificación acaecida en el año 2005 sobre la hipoteca que garantizaba el Pagaré al portador y que se determinó, que ocurrió una novación modificativa de la obligación y que tal acción colocó dicha hipoteca en rango posterior.[2]

En lo pertinente a su reclamo a la Apelada, Marymar alegó en la Demanda que el **25 de junio de 2019**, **reclamó a Stewart Title la póliza de título** y que **el 4 de marzo de 2021 Stewart Title denegó su petición** fundamentada en que la deuda que dio paso a que se emitiera la referida había sido satisfecha y que Marymar no es una sucesora de Westernbank, quien figuraba como asegurado en la póliza.  De igual forma Stewart **Title** sostuvo que **la póliza no cubría defectos en el título asumidos por el asegurado.**

En esencia, Marymar reclamó en la Demanda que es una asegurada bajo la póliza, pues Infra le cedió el Pagaré al portador y que en la alternativa, por conducto del Banco Popular e Infra, es sucesora o cesionaria de Westernbank bajo los términos de la póliza y asegurada bajo la misma. Asimismo, alegó que Stewart Title actuó de mala fe e incumplió con sus obligaciones contractuales al no satisfacer las pérdidas que alegadamente sufrió y que además, Stewart Title actuó de mala fe y de forma negligente por excederse del plazo de noventa (90) días que provee la Ley Núm. 77 de 19 de junio de 1957, según enmendada, conocida como Código de Seguros de Puerto Rico (26 LPRA sec.101 et seq.) (en adelante, "Código de Seguros") por lo que solicitó ser indemnizada por el monto de la póliza de título, de $500,000.00., entre otras partidas reclamadas.

En respuesta, el 22 de febrero de 2022, Stewart Title presentó una *Contestación a Demanda* en la que arguyó que no existe obligación contractual entre las partes, toda vez que el asegurado en la póliza no fue

---

[2] Sobre esta alegación, *Véase, Scotiabank de Puerto Rico v. Roberto Manuel Cacho Pérez, et al.*, KDC2009-0835; *Scotiabank de Puerto Rico v. Roberto Manuel Cacho* Pérez, et al., KLAN201700448.

Marymar sino Westernbank y su cesionario Banco Popular.[3] De igual forma sostuvo que Marymar tampoco es la tenedora legal ni de buena fe del Pagaré al portador y que además, **la Apelante carece de legitimación activa para entablar la Demanda**. Respecto a la póliza, Stewart Title señaló que la cubierta se basó en la validez de la hipoteca, no en los efectos que la modificación realizada al Pagaré al portador pudiera tener en términos de rango. Asimismo sostuvo que **en el año 2014 esta hipoteca se extinguió tras el Banco Popular recibir fondos del "Settlement Funds Provider" como pago total de ciertas deudas garantizadas, entre las cuales figuraron el Pagaré al portador y la hipoteca.** Stewart Title levantó además, las siguientes defensas afirmativas: (1) prescripción; (2) la Demanda no formula alegaciones que justifiquen la concesión de un remedio; (3) descorrer velo corporativo; (4) falta de nexo causal entre los daños alegados y las acciones de la demandada; (5) sanción por conducta procesal temeraria, y (6) duplicidad de remedios. Con relación al manejo de la reclamación de Marymar, Stewart Title alegó que actuó de forma diligente y de buena fe.

Así las cosas, el 1 de diciembre de 2023, Marymar presentó Solicitud *de Sentencia Sumaria Parcial* a los únicos fines de que el foro primario adjudicara la responsabilidad de Stewart Title bajo la póliza y no la causa de acción de daños y perjuicios. Tras identificar varios hechos como incontrovertidos Marymar argumentó que el "Settlement Funds Provider" y un acuerdo subsiguiente, el "Sale and Purchase Agreement", no provocaron que se cancelara el Pagaré al portador. En igual fecha, 1 de diciembre de 2023, Stewart Title presentó *Moción de Sentencia Sumaria* en la que identificó los incontrovertidos que justificaban la adjudicación sumaria de su reclamo.[4] Allí expuso que la hipoteca asegurada por la póliza de título es una distinta a la hipoteca que garantizó el Pagaré al portador[3] y que ello era suficiente para disponer de la controversia planteada por Marymar en su

---

[3] *Véase* páginas 0063-0078 del Apéndice de la Apelación.
[4] *Véase* páginas 0079-0715 del Apéndice de la Apelación.

reclamación. En la alternativa, la Apelada argumentó que el pago en finiquito aceptado por el Banco Popular por parte del "Settlement Funds Provider" provocó que la cubierta de la póliza de título terminara; que si la póliza de título aún existiera, Marymar no es una asegurada, y que en caso de serlo, la póliza de título no cubre defectos sufridos o asumidos por un asegurado. En lo pertinente a la segunda causa de acción, Stewart Title sostuvo que Marymar incumplió con el requisito de notificación previa al tanto al Comisionado de Seguros como a la aseguradora y que toda vez que la notificación constituye un requisito jurisdiccional para perfeccionar el recurso ante el foro judicial, el foro primario carecía de jurisdicción para atenderla. También, señaló que la Demanda contiene duplicidad de remedios y que no proceden los daños punitivos reclamados por Marymar.

En desacuerdo, el 26 de diciembre de 2023, Marymar presentó una oposición a la *Moción de Sentencia Sumaria* presentada por Stewart Title en la que objetó una cantidad de los hechos incontrovertidos planteados por la Apelada por considerarlos no pertinentes y alegadamente por incumplir con las Reglas de Evidencia de Puerto Rico (32 LPRA Ap. VI).

En respuesta, el 26 de diciembre de 2023, Stewart Title presentó Oposición *a Moción de Sentencia Sumaria Parcial*. En esencia, la Apelada argumentó que Marymar incumplió con la carga de probar sus alegaciones, toda vez que no demostró que la hipoteca que garantiza el Pagaré al portador fuera aquella que aparece descrita en la póliza de título y asegurada por dicha póliza. Argumentó además, que Marymar no produjo prueba para refutar lo que dispone el "Settelement Funds Provider" en torno al saldo de todas las deudas de Infra con el Banco Popular (sucesor en interés de Westernbank), incluyendo la línea de crédito que Infra obtuvo de Westernbank y que fue garantizada con un gravamen mobiliario (o prenda) sobre el Pagaré al portador. Asimismo, Stewart Title arguyó que la Apelante no probó que el Pagaré al portador fuera evidencia de una deuda entre Infra y Westernbank, ni que el "insured indebtedness" bajo la póliza de título fuera la misma deuda que surge del Pagaré al portador, ni que el acreedor del

Pagaré al portador fuera Infra, Finalmente la Apelada esbozó que Marymar tampoco probó ser sucesora de Westernbank o del Banco Popular en relación a la deuda de Infra, ni que el "insured indebtedness" en la póliza de título se refiera al Pagaré al portador y no a la acreencia de Westernbank sobre Infra por la línea de crédito de $500,000.00. Stewart Title también señaló en la *Oposición a Moción de Sentencia Sumaria Parcial* que **Marymar no logró establecer en qué momento adquirió el Pagaré al portador y** que la Apelante tampoco podía argumentar que desconocía los defectos en el título a consecuencia de la modificación.[5]

Mediante Sentencia emitida sumariamente el 2 de julio de 2024, a favor de Stewart Title el foro primario declaró *Ha Lugar* la *Moción de Sentencia Sumaria* presentada por la Apelada; desestimó sumariamente la Demanda en Daños e Incumplimiento de Contrato de Seguros, presentada por Marymar en contra de Stewart Title e impuso a la Apelante la suma de $2,500.00 por concepto de honorarios de abogado.[6] En dicha Sentencia el foro primario formuló las siguientes determinaciones de hechos incontrovertidos:

### I. HECHOS QUE NO ESTÁN EN CONTROVERSIA

### A. Hipotecas y *Pagaré al portador*

1. El 6 de junio de 2003, el matrimonio Cacho-Cambó suscribió un Pagaré al portador ante el Notario Francisco González Nieto bajo el número de testimonio 1,856. El Pagaré al portador se constituyó por la suma principal de $500,000.00, más los intereses y créditos allí pactados. (*Véase* Entrada #88 y #89 de SUMAC, Anejo 1)

2. En la referida fecha y ante igual notario, el matrimonio Cacho-Cambó garantizó el Pagaré al portador con una hipoteca mediante la Escritura Pública número uno (1).1 *Véase Entrada #88 de SUMAC (Anejo 3, págs. 1-3, 10-14). También, Entrada #89 (anejo 2, págs. 1-3, 10-14)*

3. La hipoteca objeto del Pagaré al portador gravaba el apartamento 801 del Condominio Marymar (finca 43,805) y dos "storage cellars" identificados en los incisos "B" y "C". *(Véase Entrada #89, Anejo 2 págs. 10-14).*

4. El 29 de marzo de 2004, el matrimonio Cacho-Cambó otorgó el "Acta de Rectificación" número diecisiete (17), con el fin de subsanar la omisión de la Escritura Pública número (1) referente a la responsabilidad hipotecaria, tasación y créditos sobre las fincas descritas en esta. *Véase Entrada #89 de SUMAC (anejo 2, págs. 17 y 18).*

---

[5] *Véase* Entrada Núm.100 de SUMAC, págs. 26 y 27.
[6] Véase páginas 0001-0041 del Apéndice de la Apelación.

5.      Esencialmente, del principal de la hipoteca, el inmueble "A" (finca 43,805) respondería por $480,000.00, el inmueble "B" por $10,000.00 y el inmueble "C" por $10,000.00. *Véase Entrada #89 de SUMAC (anejo 2, págs. 17 y 18).*

6.      La Escritura Pública número uno (1) se presentó el 15 de agosto de 2005 en el Registro de la Propiedad. El 5 de noviembre de 2008 quedó inscrita. *Véase Entrada #88 de SUMAC (anejo 2, págs. 4-5; anejo 4, pág. 4).*

7.      El 5 de agosto de 2005, el matrimonio Cacho-Cambó suscribió un Pagaré a favor de R-G Premier Bank, o a su orden, ante el notario Rafael Bras Benítez bajo el número de testimonio 5,404. El Pagaré a favor de R-G Premier Bank, o a su orden, se constituyó por la suma principal de $700,000.00, más los intereses y créditos allí pactados. *Íd. anejo 2, págs. 3-4; anejo 4, pág. 4.*

8.      En la referida fecha y ante igual notario, el matrimonio Cacho-Cambó garantizó el Pagaré a favor de R-G Premier Bank, o a su orden, con una hipoteca sobre el apartamento 801 del Condominio Marymar (43,805), mediante la Escritura Pública número setecientos treinta y cinco (735). *Íd*

9.      La Escritura Pública número setecientos treinta y cinco (735) se presentó el 19 de septiembre de 2005 en el Registro de la Propiedad. El 25 de abril de 2008 quedó inscrita. *Id.*

10.     El 30 de agosto de 2005, el matrimonio Cacho-Cambó otorgó junto con Westernbank la Escritura Pública número seiscientos setenta y tres (673) ante el notario Adrián J. Hilera Torres. *Véase Entrada #88 de SUMAC (anejo 8).*

11.     Surge de la escritura que Westernbank había otorgado un préstamo al matrimonio Cacho-Cambó, el cual "[se] [garantizó] parcialmente con la hipoteca evidenciada por referido el pagaré hipotecario". Entiéndase, el Pagaré al portador garantizado por la hipoteca objeto de la Escritura Pública número uno (1). *Íd. en la pág. 5.*

12.     A esos fines, las partes convinieron modificar Pagaré al portador y la hipoteca. Entre otras cosas, acordaron el tipo de interés en 0.50% anual sobre el "prime rate" y la renuncia al término prescriptivo de veinte (20) años. En su lugar, acordaron que se extendiera a veinticinco (25) años. *Íd. en las págs. 5 y 6. Véase, además, el Art. 145 de la Ley Hipotecaria y del Registro de la Propiedad, Ley Núm. 198 de 8 de agosto de 1979, 30 LPRA sec. 2469 (derogada) ("A petición de parte, autenticada ante notario, los registradores cancelarán las hipotecas que tengan más de veinte (20) años de vencidas o, si no tuvieron término de vencimiento, de constituidas. . .").*

13.     La Escritura Pública número seiscientos setenta y tres (673) se presentó el 3 de noviembre de 2005 en el Registro de la Propiedad. El 13 de noviembre de 2008 quedó inscrita. *Véase Entrada #88 de SUMAC (anejo 2, pág.5).*

**B.      Westernbank e Infra: línea de crédito**

14.     Conforme a un documento intitulado "Westernbank loan/line credit approval memorandum", la referida entidad bancaria aprobó una facilidad de crédito a favor de Infra el 31 de marzo de 2004. *Véase Entrada #89 de SUMAC (anejo 7, págs. 13-15).*

15.     En el acápite "funds to be used for" del documento, se indica que esta se aprobó con el propósito de "cancelar las facilidades de crédito con [el] [Banco Popular]". *Íd. en la pág. 13.*

16. Más adelante, en el acápite "repayment schedule and source of repayment funds", se dispuso un desembolso interino por tres (3) meses "en lo que se recibe la colateral del [Banco Popular]", en cuyo momento "se convierte en largo plazo a un término de [veinticinco] [25] años". *Id.*

17. El documento, además, identifica al matrimonio Cacho-Cambó como "cosigners" y "guarantors" de la facilidad de crédito aprobada. *Id.*

18. El crédito en cuestión se basó en un préstamo a término por la suma principal de $1,985,944.00, identificado con el número 7470018428. *Íd. en la pág. 15.*

19. En o alrededor del 3 de agosto de 2005, Westernbank aprobó reestructurar el préstamo, a petición del cliente (Infra), de la siguiente forma: un préstamo a largo plazo por la suma principal de $1,485,944.00, y una línea de crédito por la suma principal de $500,000.00, para un total de $1,985,944.00. *Íd. en la pág. 1.*

20. Como parte de la línea de crédito por $500,000.00, se incluyó como colateral el Pagaré al portador garantizado por la hipoteca de la Escritura Pública número uno (1). *Id.*

**C. Póliza de título**

21. El 30 de agosto de 2005, San Juan Abstract Company, Inc. emitió una póliza tipo ATLA, número M-9994-8584175, a nombre de Stewart Title.29 *Véase Entrada #88 de SUMAC (anejo 7). También, Entrada #89 (anejo 10).*

22. La póliza dispone en su "Schedule A" lo siguiente:

**Policy No**.: M-9994-8584175
**Loan No.:** 7470021615/1616
**Amount of Insurance**: $500,000.00
**Date of Policy**: August 30, 2005

**i. Name of Insured:**

WESTERNBANK PUERTO RICO AND/OR THEIR SUCCESSORS OR ASSIGNEES AS THEIR RESPECTIVE INTERESTS MAY APPEAR

**ii. The estate or interest in the land which is encumbered by the insured mortgage is:**

FEE SIMPLE.

iii. **Title to the estate or interest in the land is vested in:**

INFRA LIMITED, S.E.

iv. **The insured mortgage and assignments thereof, if any, are described as follows:**

Mortgage in favor of Popular Mortgage, Inc., in the amount of $500,000.00, constituted pursuant to deed number 288, on September 19, 2002, before Notary Edgar E. Balzac Rivera recorded at mobile page of volumen 1109 of Santurce Norte; modified pursuant to deed number 1, executed on June 6, 2003, before Notary Francisco González Nieto, filed for record on August 15, 2005, at entry 97 of daily book 1073; modified pursuant to deed number 673, executed on August 30, 2005, before Notary Adrian J. Hilera Torres, pending presentation at the Registry of Property of San Juan I, Puerto Rico.

iv. **The land referred to in this policy is described as follows:**

URBAN: HORIZONTAL PROPERTY: Apartment No. 801, of the Marymar Condado Condominium, located in the Santurce Norte Ward, Municipality of San Juan, Puerto Rico, with a superficial area of approximately 243.42 square meters, property number 43, 805, recorded at mobile page of volume 1190 of Santurce Norte, Registry of the Property of San Juan I, Puerto Rico. *Id.*

23. En la sección "Conditions and Stipulations" de la póliza, la figura del asegurado se define como:

(a)   "insured": the insured named in Schedule A. The term "insured" also includes [:]

(i)   the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness except a successor who is an obligor under the provisions of Section 12 (c) of these Conditions and Stipulations (reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land);

(ii) any governmental agency or governmental instrumentality which is an insurer or guarantor under and insurance contract or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage, or any part thereof, whether named as an insured herein or not; (iii) the parties designated in Section 2(a) of these Conditions and Stipulations. *Id.*

24. En la sección "Conditions and Stipulations" de la póliza, "land" se define como:

[T]he land described or referred to in Schedule A, and improvements affixed thereto, which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of Access to and from the land is insured by this policy. *Id.*

**D. Parte demandante**

25. Marymar es una compañía de responsabilidad limitada de acuerdo con las leyes de Puerto Rico, cuya organización se remonta al 3 de febrero de 2016. *Véase Entrada #89 de SUMAC (anejo 6).*

26. Del Certificado de Incorporación de Marymar se desprende que esta se creó para "[c]ualquier fin permitido por ley". *Íd. en la pág. 2.*

27. El 5 de junio de 2019, Joel Nissin Menda Cacho como vendedor, y el Lcdo. Luis G. Rullán (en adelante, "Lcdo. Rullán"), como comprador, otorgaron un "Purchase and Sale Agreement". *Véase Entrada #89 de SUMAC (anejo 18, pág. 1).*

28. En virtud de este acuerdo, Joel Nissin Menda Cacho transfirió su titularidad al Lcdo. Rullán sobre el interés propietario de Marymar. *Id.*

29. En el proceso de reclamación que precedió el recurso de epígrafe, y al presente, el Lcdo. Rullán figura como único miembro de Marymar y representante legal. *Véase Entrada #1 de SUMAC. También, Entrada #88 (anejo 1).*

**E. Parte demandada**

30. Stewart Title es una compañía de seguros foránea incorporada en el Estado de Texas autorizada a hacer negocios en el Estado Libre Asociado de Puerto Rico. Cuenta con la autorización de la Oficina del Comisionado de Seguros de Puerto Rico para emitir seguros de título. *Véase Entrada #14 de SUMAC en la pág. 1.*

31. El 12 de diciembre de 2001, Stewart Title y San Juan Abstract Company, Inc. acordaron que esta última emitiera pólizas a nombre de la primera en Puerto Rico. Parte del contrato lee así: [STEWART TITLE] appoints [SAN JUAN ABSTRACT COMPANY, INC.] as its general agent only for the purpose of issuing title policies in the name of [STEWART TITLE] with the authority, duties, limitations and conditions set fort[h] in this Agreement and in accordance with [STEWART TITLE] guidelines and instructions. [SAN JUAN ABSTRACT COMPANY, INC.] is authorized to issue [STEWART TITLE] title policies covering property in the Commonwealth of Puerto Rico. *Véase Entrada #88 de SUMAC (anejo 9).*

**F. Pleitos relacionados.** *Véase Entrada #18 de SUMAC en la pág.* 7.

32. KDC2009-0835:

i. El 6 de marzo de 2009, R&G Premier Bank presentó una Demanda de ejecución de hipoteca en contra del matrimonio Cacho-Cambó. Posteriormente, Scotiabank de Puerto Rico sustituyó a R&G Premier Bank cuando le fueron transferidos los activos de este. *Marymar 801 Acquisition v. Roberto Manuel Cacho Pérez, et al., KLCE201801536, en la pág. 9.*

ii. El 12 de febrero de 2010, una sala hermana de este tribunal dictó Sentencia Sumaria a favor de Scotiabank. Por medio de esta, declaró Ha Lugar la petición de ejecución de hipoteca y ordenó la venta en pública subasta de la finca núm. 43,805. *Véase Entrada #88 de SUMAC (anejo 4, pág. 2).*

iii. El 20 de abril de 2016, durante el trámite de ejecución de Sentencia, Marymar presentó una Demanda de Intervención. Alegó que la hipoteca que garantizó el Pagaré al portador tenía un rango preferente a la que poseía Scotiabank. *Id.*

iv. El 11 de enero de 2017, el foro primario determinó que la hipoteca inscrita a favor de Scotiabank pasó a ocupar un rango preferente al que ocupaba la hipoteca que garantizó el Pagaré al portador en posesión de Marymar. En consecuencia, desestimó la Demanda de Intervención. *Íd. en la pág. 8.*

v. El 23 de junio de 2017, el Tribunal de Apelaciones confirmó el referido dictamen. En esencia, concluyó que ocurrió una novación modificativa de la obligación respecto a la hipoteca que garantizó el Pagaré al portador en posesión de Marymar. Si bien la extensión del plazo de vencimiento no causa la cancelación del asiento, el cambio en la tasa de interés de la obligación sí. El asiento previo quedó cancelado y se extendió una nueva inscripción. En consecuencia, la hipoteca de Scotiabank advino a un rango preferente. (KLAN201700448). *Véase Entrada #88 de SUMAC (anejo 5, págs. 18 y 19).*

vi.    El 9 de febrero de 2018, notificada el día 14 de dicho mes y año, el Tribunal Supremo declaró No Ha Lugar el recurso de certiorari que presentó el matrimonio Cacho-Cambó sobre la Sentencia del foro intermedio. (CC-2018-0039). *Véase Entrada #88 de SUMAC (anejo 6, pág. 2).*

33.    KCD2016-0274:

i.    El 12 de febrero de 2016, Marymar junto con el matrimonio Cacho Cambó, presentó una Demanda y estipulación para que se dicte sentencia por consentimiento bajo la Regla 35.4 de Procedimiento Civil.47 *Marymar 801 Acquisition v. Roberto Manuel Cacho Pérez, et al., KLCE201801536, en la pág. 2.*

ii.    El matrimonio Cacho-Cambó consintió a que se dictara Sentencia a favor de Marymar por la suma adeudada, así como la ejecución y venta en pública subasta de las fincas núm. 43,805, 43,806 y 43,807. *Id.*

iii.    El 22 de febrero de 2016, la estipulación de las partes fue aprobada mediante Sentencia. El 11 de marzo de 2016, el foro primario emitió Sentencia Enmendada Nunc Pro Tunc. *Id.*

iv.    El 5 de julio de 2016, Scotiabank presentó una Solicitud Urgente de Intervención y Sometiendo Demanda de Intervención. Planteó que la hipoteca inscrita a su favor sobre la finca núm. 43,805 ostentaba un rango preferente a la hipoteca que garantizó el Pagaré al portador que poseía Marymar. *Id.*

v.    Luego de varios incidentes procesales, el foro de instancia permitió la intervención Scotiabank y dejó sin efecto la Sentencia Enmendada Nunc Pro Tunc del 11 de marzo de 2016. *Íd. en la pág. 3.*

**G. Reclamación de Marymar a Stewart Title**

34.    El 25 de junio de 2019, Marymar reclamó a Stewart Title bajo la póliza de título, según emitida por San Juan Abstract Company, Inc. el 30 de agosto de 2005 a nombre de Stewart Title. *Véase Entrada #89 de SUMAC (anejo 22).* A continuación, reproducimos lo esbozado en la carta:

Marymar 801 Acquisition, LLC is a successor/assignee under the [Policy No. M-9994-8584175].

On the date the Policy was issued, the insured mortgage was modified to increase the interest rate and extend its term. The mortgage, as modified on that date, was insured as fee simple.

When Marymar 801 attempted to foreclose on the property, the referenced mortgage was adjusted by the Puerto Rico Courts, in a final judgment, as being subordinated to a mortgage then held by Scotiabank Puerto Rico precisely because of the modification made on the date the Policy was issued. . . .

The value of the property is far below the amount owed under the other mortgage, now the priority lien, which is also in the process of foreclosure. As a result, Marymar 801 has suffered, or will suffer, a loss covered by the above-referenced Policy which, including principal and attorney's fees, is in excess of $500, 000.00. *Id.*

35.    El 17 de octubre de 2019, Stewart Title solicitó a Marymar que proveyera copia de los documentos y sentencias que acreditaran la pérdida de rango de la hipoteca objeto del Pagaré al portador. *Véase Entrada #89 de SUMAC (anejo 24, pág. 1).*

36. El 14 de enero de 2020, Stewart Title notificó a Marymar que era necesario examinarla bajo juramento. Surge de la póliza de título que la aseguradora se reservó ese derecho en caso de una reclamación. *Véase Entrada #89 de SUMAC (anejo 25, pág.2)*

37. El 9 de septiembre de 2020, Marymar envió a Stewart Title parte de los documentos solicitados. *Aclaró que los documentos que forman parte del récord público no serían producidos. Véase Entrada #89 de SUMAC (anejo 31, pág. 1)*

38. Los referidos documentos son:

i. Settlement and Release Agreement dated May 23, 2014 between Infra and other related parties and Banco Popular de Puerto Rico.

ii. Sale-Purchase Agreement dated as of May 16, 2014 between Regency Condado Center, Inc./Laguna del Mar Princess, Inc., and Regency Acquisition LLC/Laguna Acquisition LLC.

Marymar 80I Acquisition, LLC Agreement.

v. Settlement and Release Agreement dated June 3, 2019 between Marymar and Roberto Cacho and Ileana Cambó.

vi. Written Consent of the Sole Member of Marymar dated June 3, 2019.

*vii.* Purchase and Sale Agreement dated June 5, 2019 between Joel Nissin Menda Cacho and Luis G. Rullán. vii. Transfer of Interest of Sole Member of Marymar dated June 5, 2019 executed by Joel Nissin Menda Cacho. *Íd. en las págs. 1 y 2.*

39. El 5 de febrero de 2021, el Lcdo. Rullán fue examinado bajo juramento como único miembro y representante de Marymar por parte de Stewart Title a través de la plataforma Zoom. *Véase Entrada #88 de SUMAC (anejo 17, pág.1). También, Entrada #89 (anejo 21, pág. 1).*

40. La representación legal de Stewart Title expresó tener dudas respecto a cierta información detallada en los documentos que sometió Marymar. En específico, inquirió sobre el "Settlement Funds Provider". *Íd. en las págs. 12-14.*

> *P "Okay". Dice; "On the date on which the lender has received, and the feasible payment on cash of the full amount of the settlement payment, the lender will deliver to the settlement funds provider, the original of the mortgage notes and all other documents or warranties except for the guaranties executed by the guarantors." Tengo dudas de a qué se refiere ese "except for the guaranties executed by the guarantors", a ver si usted nos podría aclarar eso. Íd. en la pág. 14*

41. El Lcdo. Rullán manifestó que actuó como abogado en ese contrato, por lo que no podía "ir más allá de lo que dice el documento". *Id.* En términos generales, explicó el negocio de la siguiente manera:

> *R Esto es un "short sale" y el banco acepta eh, transar las deudas que tenía todas estas personas por una*

*X cantidad de dinero, con*
*conocimiento de que ese dinero iba*
*a venir de un "settlement funds*
*provider" que en este caso es*
*Porson. Pues se hace un segundo*
*documento y se firma, creo que fue*
*el mismo día, y ahí Porson le, le*
*dice a la entidad, le dice, "yo*
*quiero estas dos propiedades, yo*
*me voy a quedar con ellas, yo*
*pongo el dinero y te doy todas*
*las otras garantías".Íd. en la pág. 16*

42.     En respuesta a cómo el Pagaré al portador llegó a Marymar, el Lcdo. Rullán indicó que "Porson" entregó el Pagaré al portador a Infra. *Íd. en la pág. 17.* Luego, Infra se lo entregó a Marymar.

*R Bueno la idea era ejecutar esa*
*hipoteca, de manera que se pudiera,*
*pues adquirir la propiedad libre de*
*cargas y gravámenes, porque esta*
*supuestamente era la, la primera*
*hipoteca, y entonces se crea una*
*corporación que se llama Marymar*
*801 Acquisition y se le entrega el*
*pagaré que en ese momento era un*
*pagará al portador. Íd. en la pág. 18.*

43.     En respuesta a la alegada relación de Marymar con Infra, el Lcdo. Rullán reconoció en el examen bajo juramento que no hay documento en el cual conste que Infra controlaba a Marymar.

*P Una pregunta sí, porque el*
*licenciado Rullán acaba de decir*
*que Marymar fue o era controlada*
*por Infra. Entonces, de los*
*documentos que nos proveyeron no*
*surge que Infra haya sido este, ...*
*R No, no, no surge.*
*P ...miembro de, de, o sea, no surge*
*que haya sido el, el miembro como*
*se llama, eh, lo que viene a ser el*
*accionista o dueño de la entidad.*
*Sabe su, eh, surgía, de los*
*documentos que nos proveyeron*
*surgía que era una persona natural,*
*no recuerdo el nombre ahora mismo,*
*tengo que buscar el documento...*
*[...]*
*Creo que es Joel... Íd. en la pág. 20.*

*[...]*
*P Joel, ajá.*
*R Yo ese documento no lo hice, o sea,*
*y por qué, no sé, o sea, acuérdense*
*que esto era "related entities" y*
*que pues que no, no...*
*P Sí, sí.*
*R ...no hubo mucha formalidad en*
*cuanto a eso. Pero sí le puedo*
*hacer referencia eh, que cuando se*
*radica la demanda o el "concern*
*judgment", se reconoce bajo*
*juramento pues que Marymar 801 era*
*el tenedor de buena fe del pagaré.*
*P Sí.*
*R Así que en ese sentido pues*
*entiendo yo que se suple eso, pero*

*18 no, no hay, no hay ese documento.*
*19 P No hay un documento que acredite o*
*20 justifique por qué se hizo el*
*21 traspaso de Infra como tenedor del*
*22 pagaré, cuando se lo, se lo entregó [...] Id. En la pág. 21.*

*1 a Porson o a la compañía de Porson.*
*2 No hay un documento que justifique*
*3 el traspaso de, o que acredite o*
*4 por qué consideración se hizo el*
*5 traspaso del pagaré de Infra a, a*
*6 Marymar.*
*7 R Eh, no que yo conozca no. Id. en la pág. 22.*

44. El 4 de marzo de 2021, Stewart Title notificó a Marymar mediante carta que su reclamación fue denegada. *Véase Entrada #88 de SUMAC (anejo 18). También, Entrada #89 (anejo 34).*

45. Stewart Title denegó la cubierta por las siguientes razones: (1) la deuda de Infra con Westernbank fue satisfecha; (2) Marymar no es una sucesora de Westernbank, quien figura como asegurado en la póliza, y (3) la póliza no cubre defectos en el título asumidos por el asegurado. A continuación, destacamos parte de los fundamentos:

i. In the present case, the loan documents show that the Policy was issued to insure a mortgage that secured a revolving line of credit which was part of a greater credit facility granted by Westernbank to Infra. As shown in the Settlement and Release Agreement between Infra and Popular, the credit facility was paid off and the collateral, including the mortgage note secured with the Insured Mortgage, was released and returned to the borrower. Therefore, as the underlying debt was paid off, coverage under the Policy was terminated pursuant to Section 9(c) of the Conditions and Stipulations. *Íd en la pág. 7.*

ii. Notwithstanding that the underlying loan was satisfied, Marymar now claims to be the Insured under the Policy as the current holder of the mortgage note secured with the Insured Mortgage. Marymar alleges that the mortgage note currently secures a debt which exceeds $500,000.00. However, Marymar is not Westernbank's successor or assignee, and therefore not an Insured under the Policy. . ..*Id.*

iii. Additionally, the chain of events demonstrates that Marymar and its current sole member Luis G. Rull[á]n. . .had actual knowledge of the claimed title defects that affect the Insured Mortgage. Mr. Rull[á]n acted as legal counsel to Infra and to Mr. Cacho and Mrs. Camb[ó] since the time of the default of the credit facility with Popular. In addition, Mr. Rull[á]n represented Mr. Cacho and Mrs. Camb[ó] in the foreclosure actions filed by both Scotiabank and Marymar, and unsuccessfully attempted to establish the Insured Mortgage's priority through litigation. . . .As a result, Mr. Rull[á]n as sole member of Marymar agreed to and assumed the risk of loss arising from the $700,000 Mortgage when he acquired his membership interest in Marymar, and therefore any such risk is excluded from coverage under the Policy pursuant to Exclusion 3(a) of the Policy. *Íd. en las págs. 7 y 8.*

En esencia, a base de las anteriores determinaciones de hechos incontrovertidos el foro primario concluyó que Marymar no es una asegurada bajo la póliza de título, y que por tanto no existe responsabilidad contractual de Stewart Title para con Marymar conforme a la referida póliza. De igual

forma, el foro primario determinó que, conforme a los hechos incontrovertidos la póliza de título es del tipo que protege a un acreedor. Razonó el TPI citando a). *Pérez Sánchez v. Advisors Mortgage Investors, Inc.*, 130 DPR 530, 541 (1992), que dicha póliza tiene el propósito de "[garantizar] a [este] o a su cesionario el derecho real de hipoteca que tenga sobre la propiedad inmueble hipotecada, consistiendo [la] garantía en una indemnización por el balance de la deuda garantizada por la hipoteca en caso de que surja algún defecto en el título de la propiedad el cual afectará la validez de dicha garantía hipotecaria". Finalmente, como cuestión de umbral, concluyó el foro primario que en el presente caso, "el acreedor contratante y con legitimación activa era Westernbank Puerto *Rico and/or their successor or assignees as their respective interests may appear"* y que por tanto **Marymar no pudo evidenciar ser una asegurada o sucesora porque la Apelante** alegó ser una asegurada o sucesora a través de Infra. Razonó el TPI que la póliza aseguró a Westernbank, sus sucesores y a cualquier persona natural o jurídica que adviniera titular de la acreencia que en su día tuvo sobre Infra por razón de la línea de crédito.   Concluyó el foro primario que Marymar pasó por alto el texto claro de la póliza y que la Apelante no satisface el requisito de legitimación activa para reclamar a Stewart Tittle. Así las cosas, el foro primario hizo constar que aunque el TPI estimó que la falta de legitimación activa de Marymar disponía de la reclamación presentada por esta, estimó necesario aclarar ciertas objeciones que levantó Marymar en su *Oposición a Moción de Sentencia Sumaria Radicada por STGCA* en cuanto a una serie de documentos relativos a Westernbank que ambas partes—ya sea total o parcialmente—sometieron junto con sus mociones dispositivas. En síntesis, razonó el TPI que Marymar utilizó documentos que identifican a Westernbank como autor y/o emisor y estos fueron suministrados por Stewart Title durante la reclamación que precedió este pleito y el descubrimiento de prueba. Analizó el foro primario, que según Marymar esta admitió la autenticidad y el contenido de los referidos documentos "para un fin" y exige que Stewart Title

establezca la admisibilidad de los mismos documentos sobre lo que interesa proponer lo que conduce a la Regla 107 de las Reglas de Evidencia, supra, la cual dispone que, "[c]uando determinada evidencia sea admisible en cuanto a una parte o para un propósito, y sea inadmisible en cuanto a otra parte o para otro propósito, el Tribunal, previa solicitud al efecto, limitará la admisibilidad de esa evidencia a su alcance apropiado...". (32 LPRA Ap. VI, R. 107). Así las cosas concluyó el foro primario que no consta solicitud alguna de admisibilidad limitada por parte de Marymar y que la Apelante autenticó mediante admisión los documentos y no solicitó, conforme a las normas de evidencia, que su contenido fuera admitido de forma limitada. Finalmente, el TPI resuelve que el hecho de que haya autenticado y admitido su contenido "para un fin" no implica que el tribunal ignore conscientemente la procedencia de los documentos.

En lo pertinente a la solicitud de imposición de honorarios de abogado o abogada por temeridad presentada por Stewart Title al contestar la Demanda, y en las posteriores mociones, el foro primario determinó en la Sentencia, que procedía la imposición de una suma $2,500.00 a Marymar. Razonó el TPI que la Apelante incurrió en una conducta procesal obstinada y contumaz mediante la cual Marymar temerariamente presentó la reclamación estando consciente de no ser una asegurada a tenor con la póliza de título, obviando el texto claro de dicha póliza sin exponer que esta fuera imprecisa en términos de que o a quien aseguró. Destacó además el foro primario que la Apelante tampoco probó los hechos que redundan en su propia existencia como entidad. Finalmente, citando a *Ramos v. Pacheco Romero*, 209 DPR 138, 149 (2020), razonó el TPI, que la controversia objeto de la Demanda es una carente de complejidad, naturaleza novel o discrepancia honesta en cuanto al derecho aplicable.

En desacuerdo, el 24 de julio de 2024, Marymar presentó ante el TPI *Solicitud de Reconsideración de Sentencia y Solicitud de Determinaciones*

*de Hecho Enmendadas y/o Adicionales* la cual fue declarada No Ha Lugar mediante *Resolución* notificada el 31 de julio de 2024.[7]

Inconforme, Marymar presentó el recurso de epígrafe y sostiene la comisión de los siguientes errores por parte del foro primario:

> ERRÓ EL TPI AL NEGARSE A DETERMINAR LOS HECHOS CONTROVERTIDOS E INCONTROVERTIDOS SEGÚN EL PROCEDIMIENTO ESTABLECIDO EN LA REGLAS 36.4 Y 42.2 DE LAS DE PROCEDIMIENTO CIVIL.
>
> ERRÓ EL TPI AL DETERMINAR QUE LA PÓLIZA NO PODÍA TENER MÁS DE UN ASEGURADO A PESAR QUE EL CLARO E INCUESTIONADO TEXTO DE LA PÓLIZA ESTABLECE QUE INFRA ERA UN ASEGURADO ADICIONAL ("ADDITIOAL INSURED").
>
> EL TPI ABUSÓ DE SU DISCRECIÓN AL HACER UNA DETERMINACIÓN DE TEMERIDAD EN CUANTO A MARYMAR Y AL IMPONER EL PAGO DE HONORARIOS DE ABOGADO(A).

Por su parte, Stewart Title compareció ante nos el 30 de septiembre de 2024, mediante *Oposición a Apelación Civil.* En esencia, la Apelada sostiene que contrario a lo alegado por la Apelante, al dictar sentencia sumaria sobre la totalidad de la reclamación de Marymar, el foro primario solo tenía que hacer una determinación de hechos incontrovertidos que justificara la utilización del mecanismo de sentencia sumaria para la adjudicación del pleito y no una determinación de hechos en controversia. Esboza que lo último es necesario cuando el tribunal deniega la solicitud de adjudicación sumaria y decide que procede la celebración de un juicio, lo cual no es el caso ante nuestra consideración. De igual forma, sostiene la Apelada que los *loan documents* fueron autenticados y correctamente admitidos por el foro primario por lo que las determinaciones de hecho sustentadas en estos son correctas en derecho.

Señala Stewart Title que Marymar no es la asegurada bajo la póliza de título y que dichas pólizas se emiten por una compañía aseguradora a favor del dueño de un inmueble o sus acreedores hipotecarios, por lo que al atender un reclamo es necesario identificar en beneficio de quien se emitió pues la póliza solo cubre al asegurado.  De igual forma sostiene que la póliza de seguro de título hipotecario (lenders) asegura un derecho real, no un

---

[7] *Véase* páginas 1569-1587 del Apéndice de la Apelación

derecho sobre un instrumento negociable, que es un bien mueble, por lo que la póliza de título no puede asegurar tanto el interés del acreedor hipotecario sobre la línea de crédito, como el supuesto interés de Infra sobre el Pagaré al Portador. Sobre estos extremos, razona la Apelada que Marymar no demostró que Infra fuera la tenedora del Pagaré al Portador antes del 2014 por lo que no probó que ese fue el interés asegurado por la Póliza de 2005 y de los loan documents se desprende que Westernbank es el acreedor de Infra en virtud del *credit facility* que incluyó la línea de crédito de $500,000.00 garantizada por el pagaré al portador como colateral, que a su vez, estaba asegurado por una hipoteca. Sobre estos extremos, argumenta la Apelada que el *indebtednes* solo puede referirse a la acreencia de Westernbank sobre Infra en virtud de la línea de crédito de $500,000 y que por ello avalar la teoría de Marymar de que la políza de seguro de título hipotecario aseguró simultáneamente a a Westernbank y a Infra sería interpretar que la póliza de título protege tanto al acreedor hipotecario como a su deudor simultáneamente, lo que es contrario a derecho, conforme a *Pérez Sánchez v. Advisors Mortgagees* 130 DPR 530, 540 (1992). Finalmente sostiene que la Apelante fue temeraria ya que la póliza de título es clara en cuanto a que solo aseguró a Westernbank, acreedor hipotecario y a sus sucesores y que dicho asunto no es uno novel pues fue adjudicado en *Pérez Sánchez v. Advisors Mortgagees*, *supra*.

Examinados los escritos de las partes, los anejos y la Sentencia apelada, estamos en posición de resolver.

**II.**

*A.        Sentencia Sumaria*

El propósito de las Reglas de Procedimiento Civil es proveerles a las partes que acuden a un tribunal una "solución justa, rápida y económica de todo procedimiento". 32 LPRA Ap. V, R.1. Así, la Regla 36 del mencionado cuerpo procesal atiende lo referente al mecanismo de sentencia sumaria sumaria.

A la luz de sus disposiciones, si de "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y que como cuestión de derecho el tribunal debe la sentencia sumaria sumaria a favor de la parte promovente". Regla 36.3 de Procedimiento Civil, 32 LPRA, Ap. V, R. 36.3. En ese sentido, se considera un hecho material o esencial, "aquel que pueda afectar el resultado de la reclamación de acuerdo al derecho sustantivo aplicable". *Universal Ins. y otros v. ELA y otros*, 211 DPR 455 (2023) (Sentencia); *SLG Szendrey-Ramos v. Consejo de Titulares*, 184 DPR 133, 167 (2011). Cabe señalar que el juzgador no está limitado a los hechos o documentos que se produzcan en la solicitud, sino que puede tomar en consideración todos los documentos que obren en el expediente del tribunal.

Solamente se dictará sentencia sumaria en casos en los cuales el tribunal tenga ante su consideración todos los hechos necesarios y pertinentes para resolver la controversia y surja claramente que la parte promovida por el recurso no prevalecerá. Mejías *et al.* v. Carrasquillo *et al.*, 185 DPR 288*,* 299 (2012); *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 911-912 (1994). Sin embargo, el tribunal no podrá dictar sentencia sumaria cuando: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la Demanda que no han sido refutadas; (3) surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material; o (4) la moción no procede como cuestión de derecho. *SLG Szendrey-Ramos v. Consejo de Titulares, supra, pág. 168.*

Para prevalecer, el promovente de este recurso debe presentar una moción fundamentada en declaraciones juradas o en cualquier evidencia que demuestre la inexistencia de una controversia sustancial de hechos materiales sobre la totalidad o parte de la reclamación. *Roldan Flores v. M. Cuebas et al.,* 199 DPR 664, 676 (2018).

Por su parte, la parte promovida por una moción de sentencia sumaria debe demostrar que existe controversia en cuanto a algún hecho material que sea constitutivo de la causa de acción del demandante. *Oriental Bank v. Perapi et al.,* 192 DPR 7, 25-26 (2014). Así, la parte que se opone a que se dicte sentencia sumaria en su contra debe controvertir la prueba presentada y no cruzarse de brazos. *ELA v. Cole,* 164 DPR 608, 626 (2005). No puede descansar en meras afirmaciones contenidas en sus alegaciones ni tomar una actitud pasiva, sino que está obligada a presentar contradeclaraciones juradas y/o contradocumentos que pongan en controversia los hechos presentados por el promovente. *Roldán Flores v. M. Cuebas et al., supra*, pág. 677; *Ramos Pérez v. Univisión,* 178 DPR 200, 214-215 (2010).

Una vez se presenta la solicitud de sentencia sumaria y su oposición, el tribunal deberá: (1) analizar todos los documentos incluidos en ambas mociones y aquellos que obren en el expediente del tribunal; y (2) determinar si la parte opositora controvirtió algún hecho material o si hay alegaciones en la demanda que no han sido refutadas en forma alguna por los documentos. *Abrams Rivera v. ELA, DTOP y otros*, 178 DPR 914, 932 (2010).

Al examinar la procedencia de una moción que solicita disponer de un caso sumariamente, el tribunal no tiene que sopesar la evidencia y determinar la veracidad de la materia, sino que su función estriba en determinar la existencia o no de una controversia genuina, la cual amerite ser dilucidada en un juicio plenario. *JADM v. Centro Comercial Plaza Carolina*, 132 DPR 785, 802-803 (1983). De otra parte, "[t]oda inferencia razonable que se realice a base de los hechos y documentos presentados, en apoyo y en oposición a la solicitud de que se dicte sentencia sumariamente, debe tomarse desde el punto de vista más favorable al que se opone a ésta". *ELA v. Cole,* 164 DPR 608, 626 (2005) (énfasis suplido).

En el caso de revisar la determinación del TPI respecto a una sentencia sumaria, este Foro apelativo se encuentra en la misma posición que el foro de instancia para evaluar su procedencia. *Rivera Matos et al. v.*

*Triple-S et al.,* 204 DPR 1010, 1025 (2020); *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 118 (2015). La revisión que realice el foro apelativo deberá ser *de novo* y estará limitada a solamente adjudicar los documentos presentados en el foro apelado. *Vera v. Bravo*, 161 DPR 308, 335 (2004)*.* De modo que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. *Íd.* En adición a esta limitación, se ha aclarado que al foro apelativo le está vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia. *Vera v. Dr. Bravo***,** *supra*, págs. 334-335.

En *Meléndez González et al. v. M. Cuebas*, *supra*, nuestro más Alto Foro delimitó los pasos del proceso a seguir para la revisión de la sentencia sumaria por parte de este foro revisor, el cual consiste de: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles son incontrovertibles; (4) y, de encontrar que los hechos materiales realmente son incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho a la controversia. Í*d.*, págs. 118-119.

De otra parte, la Regla 42.2 de Procedimiento Civil, supra, dispone en lo pertinente:

> En todos los pleitos el tribunal especificará los hechos probados y consignará separadamente sus conclusiones de derecho y ordenará que se registre la sentencia que corresponda.
>
> […]
>
> No será necesario especificar los hechos probados y consignar separadamente las conclusiones de derecho:

(a) al resolver mociones bajo las Reglas 10 ó 36.1 y 36.2, o al resolver cualquier otra moción, excepto lo dispuesto en la Regla 39.2;
(b) en casos de rebeldía;
(c) cuando las partes así lo estipulen, o
(d) cuando el tribunal así lo estime por la naturaleza de la causa de acción o el remedio concedido en la sentencia.

**En los casos en que se deniegue total o parcialmente una moción de sentencia sumaria, el tribunal determinará los hechos en conformidad con la Regla 36.4.**

(Énfasis suplido)

La Regla 36.4 de Procedimiento Civil, *supra*, establece que cuando en virtud de una moción se dicta una sentencia que no dispone de la totalidad del pleito, o cuando se deniega el remedio solicitado, el Tribunal tendrá la obligación de resolver formulando una determinación de los hechos controvertidos e incontrovertidos que sean esenciales y pertinentes. La referida Regla establece:

Si en virtud de una moción presentada bajo las disposiciones de esta regla no se dicta sentencia sobre la totalidad del pleito, ni se concede todo el remedio solicitado o se deniega la misma, y es necesario celebrar juicio, será obligatorio que el tribunal resuelva la moción mediante una determinación de los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial y los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, y hasta qué extremo la cuantía de los daños u otra reparación no está en controversia, ordenando los procedimientos ulteriores que sean justos en el pleito, incluso una vista evidenciaria limitada a los asuntos en controversia. Al celebrarse el juicio, se considerarán probados los hechos así especificados y se procederá de conformidad.

A base de las determinaciones realizadas en virtud de esta regla el tribunal dictará los correspondientes remedios, si alguno. Regla 36.4 de Procedimiento Civil, supra.

Asimismo, en *Pérez Vargas v. Office Depot*, supra, pág. 706, el Tribunal Supremo concluyó que la Regla 42.2 de Procedimiento Civil **releva a los tribunales de consignar sus determinaciones de hechos, cuando el pleito en su totalidad es resuelto mediante un dictamen sumario. De igual manera, nuestro más alto foro aclaró que lo dispuesto en la Regla 36.4 de procedimiento Civil solo es exigible cuando se deniega total o parcialmente una moción de sentencia sumaria. *Íd*. Es decir, cuando se declara "con lugar una moción de sentencia sumaria, dicha regla es claramente inaplicable. *Íd*., pág. 704. Consonó con lo anterior, cuando el

juicio es resuelto en su totalidad, mediante dictamen sumario, "el único hecho adjudicado es justamente la inexistencia de hechos materiales en controversia". *Íd.* Por ende, "no existe necesidad de consignar los hechos sobre los cuales no existe controversia, dado que estos son los que fueron propuestos por la parte promovente". *Íd.*

B.      ***Legitimación Activa***

En nuestro ordenamiento los tribunales solamente pueden entender aquellos casos que son justiciables. *Ramos Rivera v. García García*, 203 DPR 379,434 (2019); *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920 (2011). Ello quiere decir que nuestros tribunales existen únicamente para resolver casos o controversias genuinas, surgidas entre partes opuestas, que tienen un interés real en obtener un remedio judicial que pueda afectar sus relaciones jurídicas. *Asoc. Alcaldes v. Contralor*, 176 DPR 150, 157 (2009). Una controversia no es justiciable cuando se procura resolver una cuestión política; una de las partes carece de legitimación activa; hechos posteriores al comienzo del pleito han tornado la controversia en académica; las partes están tratando de obtener una opinión consultiva, o se intenta promover un pleito que no está maduro. *Ramos Rivera v. García García*, supra, pág. 394.

En particular, legitimación activa o *standing* es la capacidad que se requiere a la parte promovente de una acción para comparecer como litigante ante el tribunal, realizar con eficiencia actos procesales y, de esta forma, obtener una sentencia vinculante. *Íd.* Su propósito principal es demostrar al tribunal que el interés del demandante en el pleito es de tal índole que, con toda probabilidad, proseguirá su causa de acción de manera vigorosa. *Íd.*; *Sánchez et al. v. Srio. de Justicia* et al., 157 DPR 360 (2002); *Hernández Agosto v. Romero Barceló,* 112 DPR 407, 413 (1982). Este elemento de justiciabilidad difiere de los otros porque gira primordialmente en torno a la parte que prosigue la acción y solo secundariamente en cuanto a las cuestiones a adjudicarse. *Co. Ópticos de P.R. v. Vani Visual Center*, 124 DPR 559, 564 (1989).

Para demostrar que ostenta legitimación activa, el promovente de una acción tiene que establecer lo siguiente: 1) que ha sufrido un daño claro y palpable; 2) que el referido daño es real inmediato y preciso, y no abstracto o hipotético; 3) que exista una conexión entre el daño sufrido y la causa de acción ejercitada, y 4) que la causa de acción surge al amparo de la Constitución o de alguna ley. *Íd.; Hernández Montañez v. Pares Alicea,* 208 DPR 727, 739 (2022)*.*

**B.     *El Contrato de Seguros y las Reclamaciones y la Póliza de Título***

En nuestro ordenamiento jurídico, la industria de seguros está revestida de un gran interés público debido a su importancia, complejidad y efecto en la economía y la sociedad. *Jiménez López et al. v. SIMED,* 180 DPR 1, 8 (2010); *SLG Francis-Acevedo v. SIMED*, 176 DPR 372, 384 (2009). Como resultado de ello, el negocio de seguros ha sido regulado ampliamente por el Estado, principalmente mediante el *Código de Seguros de Puerto Rico*, Ley Núm. 77 del 19 de junio de 1957, según enmendada, 26 LPRA sec. 101, et seq. (Código de Seguros).

El Código define el contrato de seguro como aquel "contrato mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo". Art. 1.020 del Código de Seguros, 26 LPRA sec. 102. Sobre el contrato de seguro, el Tribunal Supremo ha expresado que:

> […] Es un mecanismo para enfrentar la carga financiera que podría causar la ocurrencia de un evento en específico.
>
> Los aseguradores, mediante este contrato, asumen la carga económica de los riesgos transferidos a cambio de una prima. El contrato de seguros es, pues, un contrato voluntario mediante el cual, a cambio de una prima, el asegurador asume unos riesgos. La asunción de riesgos es, por lo tanto, uno de los elementos principales de este contrato. En resumen, en el contrato de seguros se transfiere el riesgo a la aseguradora a cambio de una prima y surge una obligación por parte de ésta de responder por los daños económicos que sufra el asegurado en caso de ocurrir el evento específico.
>
> *Coop. Ahorro y Créd. Oriental v. S.L.G.*, 158 DPR 714, 721 (2003). (Cita omitida).

Por otra parte, el Tribunal Supremo se ha expresado en múltiples ocasiones sobre la relación entre aseguradora y asegurado. En cuanto a ello, ha dispuesto que la misma es una de naturaleza contractual, que se

rige por lo pactado en el contrato de seguro, "que constituye la ley entre las partes". *TOLIC v. Febles Gordián*, 170 DPR 804, 812 (2007).

Asimismo, es norma trillada en nuestro ordenamiento jurídico que los contratos de seguro son considerados contratos de adhesión. En ese sentido, cuando estos contienen una cláusula confusa, la misma se interpretará liberalmente a favor del asegurado. *Quiñones López v. Manzano Posas*, 141 DPR 139, 155 (1996). Así, en caso de dudas al interpretar una póliza, estas deben resolverse de modo que se alcance el propósito de la misma; esto es, proveer protección al asegurado. *Íd.*, a la pág. 155.

No obstante, este análisis no se puede realizar de manera desenfrenada, sino únicamente cuando se justifique y surja claramente la necesidad de interpretación. Ello, como corolario del principio básico de derecho contractual que dispone que, cuando los términos y condiciones son claros, específicos y libres de ambigüedades, los mismos son obligatorios entre las partes. *Íd.,* a la pág. 156; *García Curbelo v. A.F.F.*, 127 DPR 747, 760 (1991).

Existen distintos tipos de contratos de seguro. Entre estos, se encuentra el contrato de seguro de título. 26 LPRA sec. 410. Con relación al contrato de seguro de título, éste se originó en Estados Unidos. *Echandi Otero v. Stewart Title*, 174 D.P.R. 355, 373 (2008). Surgió con el propósito de garantizar las transferencias de propiedad inmobiliaria, de forma tal que el título asegurado pudiera mercadearse. *Id.* El seguro de título se define como "un contrato en cuya virtud el asegurado le paga una prima al asegurador a cambio del compromiso de este último de indemnizarle en caso de que el primero sufra una pérdida, causada por gravámenes o defectos, en un título inmobiliario sobre el cual obtiene un interés." *Id*, a la pág. 374. Según Puig Brutau, el seguro de título proporciona cobertura al asegurado contra el riesgo de que, después de adquirida la propiedad, se encuentra que en el título del enajenante ya existía, en el momento de contratar el seguro, un defecto que podía privar de su derecho al adquirente. Id, a la pág. 375, citando a J. Puig Brutau, *El seguro a favor del adquirente de bienes*

*inmuebles en los Estados Unidos,* XCIII-XCIV Rev. Der. Not. 245, 254, (1976).

En Puerto Rico, el seguro de título se encuentra definido en el Art. 4.100 del Código de Seguros de Puerto Rico, 26 LPRA sec. 410, como "el seguro de dueños de propiedad inmueble u otros que tengan interés o gravámenes o cargas sobre la misma, contra pérdida por gravamen, título defectuoso o invalidez o reclamación adversa al título, y los servicios correspondientes." Según dicha definición, el seguro de título contiene varias modalidades. *Pérez v. Advisors Mortgage Investors*, 130 D.P.R. 530, 540 (1992). Existen pólizas de seguros de título expedidas por una compañía aseguradora a favor del dueño de una propiedad inmueble **o** sus acreedores hipotecarios. *Id.* a la pág. 541.

Si la póliza de seguro de título es a favor del dueño de la propiedad, usualmente se denominan "Home Owner's Policy", las cuales se utilizan para garantizarle al dueño su título e indemnizarle en caso de que dicho titular sufriera una pérdida o menoscabo en su derecho. Ahora bien, si la póliza de seguro de título es a favor de un acreedor hipotecario, conocidas como "Mortgage Policies", garantizan a éste o a su cesionario "el derecho real de hipoteca que tenga sobre la propiedad inmueble hipotecada, consistiendo dicha garantía en una indemnización por el balance de la deuda garantizada por la hipoteca en caso de que surja algún defecto en el título de la propiedad el cual afectará la validez de dicha garantía hipotecaria". *Id.* (citas omitidas). Es decir que la póliza a favor del acreedor "[garantiza] a [este] o a su cesionario el derecho real de hipoteca que tenga sobre la propiedad inmueble hipotecada, consistiendo [la] garantía en una indemnización por el balance de la deuda garantizada por la hipoteca en caso de que surja algún defecto en el título de la propiedad el cual afectará la validez de dicha garantía hipotecaria". *Pérez Sánchez* v. *Advisors Mortgage Investors*, *Inc.*, supra, pág. 541.

En lo pertinente a las reclamaciones, el Código de Seguros, *supra*, establece que "la investigación, ajuste y resolución... se hará en el per[í]odo

razonablemente más corto dentro de noventa (90) días después de haberse sometido al asegurador la reclamación". (26 LPRA sec. 2716b). Si se excede de dicho término, el reclamante "deberá mantener en sus expedientes los documentos que acrediten la existencia de justa causa...". *Íd.* Ahora bien, en *Pérez Sánchez v. Advisors Mortgage Investors, Inc.*, *supra*, el Tribunal Supremo enfatizó que, en el proceso de reclamación, se determinará si el reclamante es el asegurado, y si la aseguradora tiene la misma obligación para con el reclamante que tiene con respecto al asegurado. Íd. pág. 542. Sobre estos extremos destacó que "[g]enerally, a title policy insures only the named insured and those who succeed him in interest by operation of law; title policies do not run with the land".

F.      ***Reglas de Evidencia: Pertinencia, Identificación y Autenticación***

Para que una evidencia sea admisible debe cumplir con los requisitos que establecen las Reglas de Evidencia. Como primer requisito, toda evidencia, incluyendo la electrónica, debe satisfacer el requisito de pertinencia. *Rosado Reyes v. Global Healthcare Group*, *LLC* 205 DPR 796, 811 (2020). La Regla 401 de Evidencia, 32 LPRA Ap. VI, R. 401, establece que evidencia pertinente es aquella evidencia que "tiende a hacer la existencia de un hecho, que tiene consecuencias para la adjudicación de la acción, más probable o menos probable de lo que sería sin tal evidencia… incluye[ndo] la evidencia que sirva para impugnar o sostener la credibilidad de una persona testigo o declarante". La evidencia pertinente es admisible, excepto cuando se disponga lo contrario por imperativo constitucional, por disposición de ley o por las mismas reglas evidenciarias. 32 LPRA Ap. VI, R. 402. En cambio, la evidencia que no sea pertinente es inadmisible. Íd. La Regla 107 de las Reglas de Evidencia, supra, dispone expresamente que, "[c]uando determinada evidencia sea admisible en cuanto a una parte o para un propósito, y sea inadmisible en cuanto a otra parte o para otro propósito, el Tribunal, **previa solicitud al efecto**, limitará la admisibilidad de esa evidencia a su alcance apropiado...". (Énfasis suplido). (32 LPRA Ap. VI, R. 107).

Una vez se establece que la evidencia propuesta es pertinente, esta tiene que cumplir con el requisito de autenticación. *Rosado Reyes v. Global Healthcare Group, LLC*, *supra*, pág. 811. Explica el profesor Chiesa que autenticación es "establecer que lo que el proponente sostiene que la evidencia es, efectivamente lo es". Este requisito aplica a toda prueba que no sea "testimonio en vivo". Se trata del elemento descrito como la *mismidad*. E.L. Chiesa, *Tratado_de_Derecho Probatorio*, San Juan, Pub. J.T.S., Tomo. II, 2005, pág. 908.

La Regla 901 de las Reglas de Evidencia dispone sobre estos extremos que "[e]l requisito de autenticación o identificación como una condición previa a la admisibilidad se satisface con la presentación de evidencia suficiente para sostener una determinación de que la materia en cuestión es lo que la persona proponente sostiene". 32 LPRA Ap. IV, R. 901. El Tribunal Supremo ha explicado que la autenticación o identificación es una condición de hecho que es necesario establecer para demostrar la pertinencia de la evidencia real demostrativa que se ofrece en evidencia. *Pueblo v. Bianchi Álvarez*, 117 DPR 484, 492-493 (1986). Una vez sea debidamente autenticada, la evidencia será admisible, salvo que el tribunal la excluya al amparo de la Regla 403 de Evidencia, 32 LPRA Ap. VI, R. 403, o que opere alguna regla de exclusión de derecho probatorio. Ahora bien, la decisión sobre cuánto valor probatorio se debe otorgar a la evidencia admitida es una posterior y aparte que no debe confundirse con el análisis de autenticación. *Rosado Reyes v. Global_Healthcare_Group,_LLC, supra*, pág. 803. La Regla 901 de Evidencia dispone una lista de ejemplos, no taxativa, mediante los cuales se puede autenticar evidencia. *Rosado Reyes* v. *Global Healthcare Group, LLC*, supra, pág. 813. A esos fines, la aludida Regla dispone lo siguiente:

B)   De conformidad con los requisitos del inciso (A) de esta Regla y sin que se interprete como una limitación, son ejemplos de autenticación o identificación los siguientes:

(8)   Autenticación mediante admisión:

> Un escrito, u otro material, puede ser autenticado mediante evidencia de que la parte contra quien se ofrece admitió su autenticidad en cualquier momento, o mediante evidencia de que ha sido aceptado como auténtico por la parte contra la cual se ofrece.

(Énfasis suplido) (32 LPRA Ap. VI, R. 901 B (8)).

Es preciso destacar además, que la Regla 107 de las Reglas de Evidencia, supra, dispone en lo pertinente que, "[c]uando determinada evidencia sea admisible en cuanto a una parte o para un propósito, y sea inadmisible en cuanto a otra parte o para otro propósito, el Tribunal, **previa solicitud al efecto, limitará la admisibilidad de esa evidencia a su alcance apropiado...**". (Énfasis suplido). (32 LPRA Ap. VI, R. 107).

**G.** *Honorarios de abogado.*

La Regla 44.1 (d) de Procedimiento Civil, 32 LPRA Ap. V, R. 44 (d), reconoce la facultad discrecional del foro de primera instancia para imponer honorarios por temeridad al disponer que "[e]n caso que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al o a la responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda corresponda a tal conducta". La sanción pecuniaria por conducta temeraria tiene el propósito de disuadir la litigación frívola y fomentar las transacciones mediante sanciones que compensen a la parte victoriosa los perjuicios económicos y las molestias producto de la temeridad de la otra parte. *Marrero Rosado v. Marrero Rosado,* 178 DPR 476, 505 (2010). La temeridad se refiere a actuaciones de una parte que hacen necesario un pleito que se pudo haber evitado, que lo prolonga innecesariamente o que obliga que lo otra parte incurra en gestiones evitables. *Íd.*, pág. 504. En fin, un litigante actúa con temeridad cuando con terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconvenientes de un pleito. *C.O.P.R. v. S.P.U.*, 181 DPR 299, 342 (2011).

La adjudicación de si una parte obró o no temerariamente descansa en la sana discreción del Tribunal de Primera Instancia. *Torres Vélez v. Soto*

*Hernández*, 189 DPR 972, 993-994 (2013). Una vez determinada la temeridad, la imposición de honorarios de abogado es mandatoria. *Montañez v. U.P.R.,* 156 DPR 395, 424 (2002). Los tribunales descansarán en su discreción y determinarán la cuantía a concederse a base del grado de temeridad, el trabajo realizado, la duración y naturaleza del litigio, la cuantía involucrada y el nivel profesional de los abogados. *C.O.P.R. v. S.P.U., supra*, págs. 342-343.

El Tribunal Supremo ha opinado que no existe temeridad en aquellas controversias complejas, irresueltas, o cuando no existen precedentes establecidos sobre la cuestión. Tampoco se configura la temeridad cuando el litigante actúa conforme a la apreciación de una cuestión de derecho, aunque ésta sea errónea; o cuando existe alguna desavenencia honesta en cuanto a quién favorece el derecho aplicable **a** los hechos del caso. *Santiago v. Sup. Grande,* 166 DPR 796, 821 (2006).

**III.**

Marymar sostiene en su primer señalamiento de error que incidió el TPI al no hacer una determinación de hechos en controversia. Arguye la Apelante que como el foro primario no adjudicó a su favor su solicitud de sentencia sumaria parcial, el TPI venía obligado a hacer dicha determinación. No tiene razón la Apelante. El foro primario declaró ha lugar la moción de sentencia sumaria presentada por la Apelada y **adjudicó sumariamente la totalidad del pleito a su favor**. Marymar había presentado una solicitud de sentencia sumaria parcial, por lo que la Apelante no se opuso a la utilización del mecanismo procesal de sentencia sumaria. Si bien, como cuestión de derecho su adjudicación no le favoreció, el TPI adjudicó sumariamente la totalidad del pleito al declarar Ha Lugar la Moción de Sentencia Sumaria presentada por la Apelada por lo que el foro primario no tenía que hacer una determinación de hechos en controversia. Sobre estos extremos en *Pérez Vargas v. Office Depot*, supra, pág. 706, el Tribunal Supremo concluyó que la Regla 42.2 de Procedimiento Civil **releva a los**

**tribunales de consignar sus determinaciones de hechos, cuando el pleito en su totalidad es resuelto mediante un dictamen sumario.**

Como segundo señalamiento de error, Marymar sostiene que incidió el foro primario al determinar que la póliza de título no podía tener más de un asegurado. Arguye que el texto de la póliza de título establecía que Infra era un asegurado adicional o *Additional Insured.* Sostiene además en su tercer señalamiento de error que incidió el foro primario al desestimar su reclamación por falta de legitimación activa.

Es preciso destacar que *loan documents* fueron autenticados y correctamente admitidos por el foro primario por lo que las determinaciones de hecho sustentadas en estos son correctas en derecho. Entre los que medios que contempla, se destaca la autenticación de evidencia mediante admisión o la aceptación como auténtico por la parte contra quien se ofrece. Esto precisamente fue lo que ocurrió en el caso de epígrafe, cuando la Apelante autenticó los documentos para su admisión sin que esta hubiese hecho una solicitud previa al tribunal para que la autenticación de la prueba presentada por esta fuese limitada. Aclarado este punto, en el caso que nos ocupa, Marymar alegó ser "titular" de un Pagaré al portador. Indicó que la hipoteca del referido pagaré se garantizó con una póliza de título emitida a nombre de Stewart Title. Según Marymar, dicha hipoteca perdió el rango de primera en el Registro de la Propiedad como resultado de una alegada solicitud de modificación por parte de San Juan Abstract Company, Inc. Esta última estaba autorizada a emitir pólizas a nombre de Stewart Title en Puerto Rico. También, esbozó una serie de hechos con el fin de demostrar que Stewart Title se demoró injustificadamente en el proceso de investigar, ajustar y resolver su reclamación.

. Sin embargo, como bien sostuvo y probó Stewart Title con la prueba documental incontrovertida, Marymar no es una asegurada bajo la póliza de título por lo que no existe obligación contractual entre las partes, debido a que el asegurado en la póliza de título fue Westernbank y su cesionario Banco Popular, no Marymar.  Es decir que tiene razón Stewart Title, y el foro

primario al resolver que la acreencia que motivó la expedición de la póliza de título quedó saldada en su totalidad previo a que Marymar entrara en posesión del Pagaré al portador. La consecuencia del referido saldo fue que la cubierta terminó a tenor con las condiciones de la propia póliza. Es por ello que tampoco erró el foro primario al concluir que la Apelante carecía de legitimación activa para reclamar cumplimiento con la póliza de título.

Concluimos que Marymar no es la asegurada bajo la póliza de título y que dichas pólizas se emiten por una compañía aseguradora a favor del dueño de un inmueble o sus acreedores hipotecarios, por lo que al atender un reclamo es necesario identificar en beneficio de quien se emitió pues la póliza solo cubre al asegurado. Asimismo, reiteramos que la póliza de seguro de título hipotecario (lenders) asegura un derecho real, no un derecho sobre un instrumento negociable, que es un bien mueble, por lo que la póliza de título no puede asegurar tanto el interés del acreedor hipotecario sobre la línea de crédito, como el supuesto interés de Infra sobre el Pagaré al Portador. Sobre estos extremos, Marymar no demostró que Infra fuera la tenedora del Pagaré al Portador antes del 2014 por lo que tampoco probó que ese fue el interés asegurado por la Póliza de 2005. Además, de los loan documents se desprende que Westernbank es el acreedor de Infra en virtud del *credit facility* que incluyó la línea de crédito de $500,000.00 garantizada por el pagaré al portador como colateral que a su vez estaba asegurado por una hipoteca. Finalmente, reiteramos que como bien concluye el foro primario Sobre estos extremos, el *indebtednes* solo puede referirse a la acreencia de Westernbank sobre Infra en virtud de la línea de crédito de $500,000, por lo que avalar la teoría de Marymar de que la póliza de seguro de título hipotecario aseguró simultáneamente a Westernbank y a Infra sería interpretar que la póliza de título protege tanto al acreedor hipotecario como a su deudor simultáneamente, lo que es contrario a derecho, conforme a *Pérez Sánchez v. Advisors Mortgagees* 130 DPR 530, 540 (1992).

Finalmente sostiene la Apelante que incidió el foro primario al hacer una determinación de temeridad en su caso ya que su argumento es que era una asegurada adicional por lo que se trata de un asunto novel.

Surge del tracto procesal del caso de epígrafe que la Apelante primeramente no pudo probar los hechos que redundan en su propia existencia ya que no desfiló prueba de que fuera creada por Infra ni de que fuera su sucesora e insistir mediante el despliegue de una conducta desprovista de fundamentos y sin que se tratara de un asunto novel. Dicha conducta reiterada obligó a la Apelada a asumir innecesariamente las molestias, gastos trabajos e inconvenientes de un pleito. *Véase Andamios de PR v. Newport Bonding.*, 179 DPR 503, 520 (2010). Con estos antecedentes, concluimos que no incidió el foro primario al concluir que Marymar fue temeraria, ya que la póliza de título es clara en cuanto a que solo aseguró a Westernbank, acreedor hipotecario y a sus sucesores y dicho asunto no es uno novel pues fue adjudicado en *Pérez Sánchez v. Advisors Mortgagees*, *supra*.

**IV.**

Por los fundamentos anteriormente expuestos, los cuales hacemos formar parte de esta Sentencia, confirmamos el dictamen apelado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones